IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SYNTHES SPINE COMPANY, L.P.,　　　:
　　　　　　　　　　　　　　　　　　:
　　　　Plaintiff,　　　　　　　　　:　　　CIVIL ACTION
　　　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
ROBERT WALDEN, et al.,　　　　　　 :
　　　　Defendants.　　　　　　　　　:　　　NO.  04-CV-4140

**MEMORANDUM  OPINION**

J. Davis                                                        October 20, 2006

Presently before the Court are plaintiff's first motion for contempt as to damages ("first contempt motion") (Doc. No. 24), plaintiff's amended second motion for contempt as to liability and damages ("second contempt motion") (Doc. Nos. 64, 80), and contempt defendants' responses thereto (Doc. Nos. 81-82).

For the following reasons, this Court grants in part and denies in part plaintiff's request for damages as to the first motion for contempt (Doc. No. 24); and grants in part and denies in part plaintiff's amended second motion for contempt (Doc. No. 64).

I.      **Factual and Procedural History**

Plaintiff Synthes Spine Company ("Synthes" or "plaintiff") is a corporation in the business of designing, developing, and selling spinal implant devices and instruments used to facilitate their implantation.  (See Doc. No. 1, at 3.)  Defendants Robert Walden ("Walden") and Christopher Bell ("Bell") (collectively "contempt defendants") are former Synthes' sales

1

consultants who respectively sold products in Synthes' Charleston South territory and Atlanta West territory.  Following their resignation, Walden and Bell immediately began working for 4 Spine LLC ("4 Spine"), the exclusive distributor of the spinal implant devices of Globus Medical, Inc. ("Globus"), a competitor of Synthes.

### A.      Complaint and Settlement

On September 1, 2004, Synthes filed a complaint against Walden, Bell, and Jerry Stovall (collectively "defendants"), alleging that defendants violated their non-compete and confidentiality agreements with Synthes by immediately selling Globus products for 4Spine in their former Synthes territories.  (See Doc. No. 1 ¶¶ 81-114.)  On September 2, 2004, Synthes moved for and obtained a temporary restraining order against defendants.  (See Doc. No. 4.)  A hearing on Synthes' motion for a preliminary injunction was ultimately scheduled for September 27, 2005.  (See Doc. No. 9.)

On September 27, 2004, prior to the hearing, the parties reached an agreement.  The Court memorialized this agreement as a stipulated Final Order (the "Final Order").  (See Doc. No. 19.)  The Final Order contains three main prohibitions, which read as follows:

1.      For the period from the date of this Order up to and including April 27, 2005, Defendants Walden, Bell and Stovall will not engage in any competitive activity within either of the territories formerly assigned to them as of August 13, 2004 as employees of Plaintiff Synthes Spine Company, LLP, known as the 'Atlanta West' and 'Charleston South' territories.  This means that within either of these territories, they shall not, for the restricted period from the date of this Order up to and including April 27, 2005, engage in sales calls, promotion of products, or support of surgeries, for 4Spine, Globus, or any other competitor of Plaintiff Synthes Spine Company L.P.

2.      For the period from the date of this Order up to and including April 27, 2005, Defendants Walden, Bell and Stovall will not solicit business from any hospital, hospital employee, physician, or physician staff member with whom they had

solicited on behalf of Plaintiff Synthes Spine Company L.P. in the last year of their employment.

3.  For the period from [the] date of this Order up to and including April 27, 2005, Defendants Walden, Bell and Stovall are prohibited from any involvement with Globus Medical, Inc., 4Spine LLC, and their respective owners, directors, officers, employees, medical advisory staff, or agents with such involvement being for the purpose of promoting or selling competing products in the Atlanta West and Charleston South territories.  This prohibition means that, during the restricted period from the date of this Order through April 27, 2005, Walden, Bell, and Stovall shall not refer business in these territories to other persons, they shall not provide advice about business in these territories, and they shall not participate in planning business development in these territories.

(Final Order ¶¶ 1-3.)  The Final Order prescribed procedures for its enforcement through a

contempt action.   (Id. ¶ 6.)

## B.    First Motion for Contempt

On November 17, 2004, Synthes filed its first contempt motion, alleging that defendants

violated the Final Order.  (See Doc. No. 29.)   On April 5, 2005, the Court granted Synthes'

motion for contempt in part and denied Synthes' motion for contempt in part.  (See April 5, 2005

Opinion, Doc. No. 45, at 15.)

The Court found only Walden to be in contempt of the Final Order.  Specifically, the

Court found that Walden: (a) violated ¶ 1 and ¶ 3 of the Final Order by soliciting and inducing

Dr. Khoury, a doctor who belongs to the private practice known as Charleston Neurological

Associates ("CNA"),[1] during the period covered by the Final Order ("restricted period") to use

Globus products for surgeries at Trident Hospital ("Trident"); and (b) violated ¶ 2 of the Final

Order by soliciting Cindy Anderson ("Anderson"), a nurse practitioner at CNA, during the

---

[1]CNA consists of three doctors, Dr. Rawe ("Rawe"), Dr. Khoury ("Khoury"), and Dr Cuddy ("Cuddy"), and a nurse practitioner, Cindy Anderson ("Anderson").   (See April 5, 2005 Opinion, at 4.)

restricted period to participate in a Globus disc study.  (See April 5, 2005 Opinion, at 12.)[2]
However, because the parties did not address the issue of damages, the Court scheduled a
separate hearing on damages as to the two findings of contempt.  (Id. at 15.)

###### C.     First Contempt Hearing

On June 7, 2006, the Court conducted a hearing as to damages on the first contempt
motion.   Linda Haas ("Haas"), a Synthes employee who currently manages the South Carolina
territory within which Walden formerly operated, James Stavros ("Stavros"), a forensic
accountant serving as Synthes' damages expert, and Walden offered testimony.

###### 1.     Haas

Haas testified that Walden's actions interfered with Synthes' ability to access CNA
physicians to pursue business opportunities.  (See Amended Transcript of June 7, 2006 Hearing
("June 7, 2006 Tr."), at 14-18.)  In particular, Haas testified that after joining Synthes on October
1, 2004, she attempted to pursue business with CNA on behalf of Synthes, which included
sending letters to physicians expressing interest in future business relations, meeting with CNA
physicians and staff, including Dr. Rawe, Dr. Cuddy, and Anderson, to discuss current
technologies of medical devices, and offering CNA physicians a trip to Synthes' headquarters to
discuss product development.  (Id. at 15-17.)   However, despite her fifteen-year relationship
with the physicians at CNA, Haas testified that CNA cut off contact with Haas and Synthes
between November 2004 and March 2005.  (Id. at 15-18.)  Since November 2004, CNA has
conducted no business with Synthes, despite Haas' active solicitation of CNA.  (Id. at 18, 28.)

---

[2]The Court denied Synthes' contempt motion to the extent Walden engaged in "merely
social" contact with doctors, staff, and hospitals, such as Dr. Reuben, covered under one of the
prohibitions in the Final Order ("covered entities").  (Id. at 14.)

On cross-examination, Haas testified that Waldens' efforts to have CNA do a cervical disc study using Globus' products failed, indeed, that CNA chose to do a disk study with a competitor, Danek, and never participated in a Globus study.  (Id. at 26.)  Haas also admitted that she did not know why CNA chose to do the disc study with Danek, but that CNA was a long time purchaser of Danek products, "primarily" a Danek user.  (Id. at 26-30, 41.)  Haas further testified that, at the time CNA agreed to do the disc study with Danek, Synthes lacked a test site to offer CNA for performance of the study. (Id. at 26.)

Haas also confirmed, on cross-examination, the existence of other factors that may have influenced CNA's decision not to use Synthes' products at St. Francis Hospital ("St. Francis"), where CNA performs many of its surgeries.  Specifically, Haas conceded that St. Francis implemented a capitated pricing structure, which restricted access to new technology, and that St. Francis entered into an exclusive contract to purchase all bone product, the primary product that Synthes was attempting to sell to CNA, from Danek. (Id. at 29-30.)

### 2.    Stavros

Stavros, plaintiffs' damages expert, calculated Synthes' damages in terms of lost profits. Stavros testified that, as a result of Walden's solicitation of Anderson and Dr. Khoury, Synthes suffered:  (a) $15,250 in lost profits from surgeries Dr. Khoury performed at Trident and St. Francis during the restricted period; (b) $3,247 in lost profits from surgeries that Dr. Rawe performed at St. Francis during the restricted period; and (c) $67,021 in lost profits from CNA sales at St. Francis during the restricted period.  (See June 7, 2006 Tr., at 53-56, 59; Stavros Statistics, Pl. Ex. 87.)  To compute these damages, Stavros multiplied Synthes' lost sales, what Stavros calculated as the amount of sales for surgeries using non-Synthes products performed by

Dr. Khoury, Dr. Rawe, and CNA at Trident and St. Francis during the restricted period, by an actual gross profit margin of 71.9%; this figure was than adjusted to account for Pennsylvania's statutory interest rate of 6%.  (June 7, 2006 Tr., at 52-53.)

Stavros also testified that Walden's contemptuous behavior caused Synthes to suffer damages beyond April 27, 2005, the end of the restricted period.  (Id. at 59-60.)  Using the same methodology for calculating lost profits during the restricted period, Stavros determined that Synthes lost $77,334 in profits for the seven-month period after April 27, 2005.  (Id. at 60-61.)

On cross-examination, Stavros admitted that, one week prior to issuing his expert report, he authored an e-mail stating that the documents in his possession did not provide a sufficient basis to calculate damages and that any damage calculation would be speculative.  (Id. at 81-82; Stavros' e-mail, Def. Ex. 30.)  Stavros further admitted that he relied upon information provided by Haas to calculate damages, including Haas' beliefs that 80% of Synthes' sales for St. Francis was connected to CNA and that CNA would have agreed to visit Synthes if Globus never offered the disk study to CNA.  ( June 7, 2006 Tr., at 58, 76-77, 95-96.)  Stavros further confirmed that, in an October 26, 2005 e-mail, authored the day before Stavros issued his expert report, Haas not only informed Stavros that Synthes did not have the capacity to offer CNA a test site for artificial cervical discs, but also stated that "[w]e will never know what would have happened if Walden had not been involved with Khoury."  (Id. at 77-78; Haas e-mail, Def. Ex. 22.)

Stavros also admitted that he was offering no opinion on the issue of causation, indeed, that he was assuming a causal link, for purposes of calculating damages, between Walden's solicitation of Dr. Khoury and Anderson and Synthes' loss of sales with respect to CNA's business at St. Francis, Dr. Raw's surgeries at St. Francis, and Dr. Khoury's surgeries at Trident

and St. Francis.  (June 7, 2006 Tr., at 62, 87.)  Despite assuming causation, Stavros

acknowledged, with respect to the recovery of damages for surgeries performed at St. Francis,

that Synthes primarily sold bone product to CNA for use at St. Francis, that St. Francis entered an

exclusive contract with Danek to purchase bone product, that CNA was primarily a Danek user,

and that Synthes replaced its sales representative for St. Francis in early 2005.  (Id. at 84-86.)

Furthermore, with respect to the recovery of damages for Dr. Khoury's use of non-Synthes

products for surgeries at Trident and St. Francis, Stavros testified that he lacked information as to

whether Dr. Khoury, if he did not use Globus' products, would have used Synthes' products

during the surgeries he performed at Trident, that he had no information as to whether Dr.

Khoury ever performed a surgery at Trident using Synthes' products, and that Dr. Khoury is not

currently using Globus' products and has always been a user of Danek's products.  (Id. at 91-92.)

### D.      Second Motion for Contempt

On March 15, 2005 and March 29, 2005, Synthes notified defendants' counsel as to

additional allegations of contempt by Bell and Walden.  (See Doc. No. 53.)  Synthes filed a

second motion for contempt on April 19, 2005, which was later amended on August 12, 2005.

(See Doc. Nos. 48, 64.)  The Court held a hearing on June 7, 2006 and on June 27, 2006.

#### 1.      Evidence of Contempt Against Walden

During his employment with Synthes, Walden was responsible for servicing the

Charleston South territory.  This territory included Beaufort Memorial Hospital ("Beaufort"),

Trident Regional Medical Center ("Trident"), Roper Hospital ("Roper"), and East Cooper

Hospital ("East Cooper"), which was removed from the Charleston South territory on February

12, 2004.  It also included surgeons operating at one of these facilities, their staff, operating room

personnel, and other hospital personnel with the capacity to influence the selection of implant vendors.

Walden offered little objection, if any, to Synthes' description of the extent of his contacts with staff and physicians at Beaufort, Trident, Roper, and East Cooper during the restricted period.  Walden also conceded that developing and maintaining relationships with surgeons is a "very important" part of the sales consultant profession.  (Transcript of June 27, 2006 Hearing ("June 27, 2006 Tr."), at 207.)   Nonetheless, Walden testified that, during the restricted period, he made it clear to physicians, administrators, and other personnel that he was under the restrictions identified in the Final Order, and explained these restrictions.  (Id. at 166.) He further testified that, during the restricted period, his contact with covered entities was merely "social":  he never referred business or participated in planning business at Beaufort, Trident, or Roper hospitals, he never solicited business on behalf of 4Spine or Globus from any hospital, physician, or medical staff from which he solicited business during his last year of employment with Synthes, and he never engaged in sales calls, promotion or products, or support or surgeries for 4Spine or Globus at Beaufort, Trident, or Roper.  (Id. at 164-175.)  Walden further testified that East Cooper was not a covered entity because it was removed from the Charleston territory on February 12, 2004 and because he never solicited business from this hospital within the last year of his employment with Synthes.  (Id. at 179-186.)

### a.      Beaufort

Walden engaged in the following contact with Beaufort physicians and staff during the restricted period:  (a) Walden took Dr. Reuben on lunches, golf outings, and fishing trips, and sent Dr. Reuben anniversary and Christmas gifts; Walden charged many of these activities to his

4Spine AMEX card, including an October 25, 2004 restaurant gift certificate for $150.00, a February 27, 2005 lunch and golf outing, a March 6, 2005 golf outing at a cost of $643.65, and a May 2005 fishing trip at a cost of $1,400; (b) Walden sponsored a happy hour for Beaufort staff on November 17, 2004; and (c) Walden learned from Dr. Reuben that Beaufort intended to reduce its number of spinal implant vendors, communicated this information to Globus personnel, and subsequently facilitated a meeting between Globus and 4Spine representatives, Dr. Reuben, and Beaufort personnel on December 9, 2004. (See October 24, 2005 Walden Dep., Pl. Ex. 281, at 49-51, 56-57, 62-69, 76-77, 91-92, 99-100, 113, 124; January 19, 2005 Walden Dep., Pl. Ex. 14, at 71, 80; AMEX Statements, Pl. Ex. 120, 134; June 7, 2006 Tr., at 229-230, June 27, 2006 Tr., at 170-172, 216, 219-229; 4Spine e-mail, at Ex. 233, 234.)  Furthermore, shortly after the expiration of the restricted period, Walden recommended Dr. Reuben for Globus' Advisory Board.  (See June 7, 2006 Tr., at 218-219.)

Haas testified that Synthes lost some of its business with Dr. Reuben following Walden's resignation, particularly with respect to cervical bone and cervical plate products, although Steve Davis ("Davis"), another Synthes representative for the territory that Walden previously serviced, testified that he sold $65,000 in implants per month to Dr. Ruben during the restricted period. (See June 7, 2006 Tr., at 207-208, 236.)   Synthes was also able to retain the entirety of its business with Dr. Strohmeyer, a physician who performed surgeries at Beaufort.  (Id. at 207-208.)  4Spines' sales to Beaufort during the restricted period totaled $260,020.  (See 4Spine Sales, Pl. Ex. 229; Stavros Statistics, Pl. Ex. 87, at Exhibit 2.)  Stavros' calculations of Synthes' lost profits at Beaufort ranged from $61,814 to approximately $186,954.  (Stavros Statistics, Pl. Ex. 87, at Exhibit 2; see also Stavros Supp. Rep., Pl. Ex. 292.)

9

### b.      Trident

Walden engaged in the following contact with Trident physicians and staff during the restricted period:  (a) Walden took Dr. Khoury to lunch on October 6, 2004, traveled with Dr. Khoury to Globus' headquarters on December 29, 2004, and sent Dr. Khoury a Christmas gift in 2004; Walden paid for the October 6, 2004 lunch through his 4Spine AMEX card, and 4Spine or Globus subsidized the trip to Globus' headquarters; (b) Walden took Dr. Marzluff on a November 21, 2004 fishing trip and a March 2, 2005 lunch, both of which were charged to his 4Spine AMEX card, and sent Dr. Marzluff a Christmas gift in 2004; (c) Walden took Dr. Tyler on a November 21, 2004 fishing trip and sent Dr. Tyler a Christmas gift in 2004; (d) Walden took Dr. Wilson on two lunch outings (on February 14, 2005 and October 23, 2005) and one golf outing, and sent Dr. Wilson a Christmas gift in 2004; (e) Walden took Dr. Stovall on an all-expense paid ski trip from March 18-22, 2005, during which they stayed at the condominium of David DeFrancis ("DeFrancis"), a co-principal and co-owner of 4Spine, to a professional tennis tournament on April 14-15, 2005, and to a catered party at Walden's house, the cost of which was charged to his 4Spine Amex card, and sent Dr. Stovall a Christmas gift in 2004.  (See October 24, 2005 Walden Dep., Pl. Ex. 281, at 53-54, 57-59, 63-66, 73-74, 79-80, 83-90, 101, 105-106, 112, 123-124; January 19, 2005 Walden Dep., Pl. Ex. 14, at 72-73, 95; AMEX Statements, Pl. Ex. 120, 123, 134, 145, 146, 147; June 27, 2006 Tr., at 300; Demski Dep., Pl. Ex. 272, at 63-68; October 14, 2005 Bell Dep., Pl. Ex. 266, at 49-50, 54, 109-110; 4Spine and Globus e-mails, at Pl. Ex. 167, 239, 257, 259, 261.)  In addition, Walden contacted David Paul ("Paul"), Globus' founder and CEO, about Dr. Khoury's possible participation in an artificial disc study.  (See October 24, 2005 Walden Dep., Pl. Ex. 281, at 83-84; Demski Dep., Pl. Ex.

272, at 63-64.)

Haas testified that, after Walden's resignation, she was unable to arrange meetings with Drs. Marluff and Tyler, who had become users of Globus' products.  (See June 7, 2006 Tr., at 201.)  Haas also testified that following two separate meetings in October 2004 with Dr. Rawe and Dr. Khoury, CNA stopped doing business with Synthes.  (Id. at 203-204.)  Prior to Walden's resignation, Synthes was doing nearly $200,000 a month in business with Trident, and, following Walden's resignation, this figure dropped to $7,200 a month.  (Id. at 207; see also Synthes' Sales Statistics, Pl. Ex. 73.)  4Spine's sales at Trident during the restricted period was $923,070, and Stavros calculated that Synthes' lost profits were between $743,162 and $843,576.  (See Stavros Statistics, Pl. Ex. 87, at Exhibit 2; 4Spine Sales Statistics, Pl. Ex. 229.)

### c.    Roper

Walden had the following contact with Roper physicians and their staff during the restricted period: (a) Walden sent Dr. Aymond a Christmas gift in 2004; (b) Walden purchased cigars at a price of $726.82 for Dr. Pacult on October 13, 2004; Walden charged the cost of these cigars to his 4Spine AMEX card; (c) Walden attempted unsuccessfully to set up two dinners with Dr. Pacult in March 2005; (d) Walden treated Dr. Pacult's entire office staff to drinks and appetizers on January 11, 2005, the cost of which was charged to his 4Spine AMEX card; (e) Walden sent Dr. Worthington a Christmas gift in 2004 and set up a conference call with Paul discussing "follow up" with Dr. Worthington.  (See October 24, 2005 Walden Dep., Pl. Ex. 281, at 12-13, 80-82, 102-104, 105-108, 112; January 19, 2005 Walden Dep., Pl. Ex. 14, at 71-72, 82-84; AMEX Statements, Pl. Ex. 120, 128; Roof Dep., Pl. Ex. 277, at 58; Demski Dep., Pl. Ex. 272, at 63-64.)

11

Haas testified that despite the efforts of Synthes' representatives to set up meetings with Dr. Pacult and Dr. Worthington during the restricted period, these doctors were non-responsive. (See June 7, 2006 Tr., at 210.)  4Spine's sales at Roper during the restricted period were $245,370, and Stavros' calculations of Synthes' lost profit ranged from approximately $176,421 to $310,334.  (See Stavros Statistics, Pl. Ex. 87, at Exhibit 2; 4Spine Sales Statistics, Pl. Ex. 229; Stavros Supp. Rep., Pl. Ex. 292.)

### d.    East Cooper

Walden had the following contact with East Cooper physicians and their staff during the restricted period: (a) Walden attended surgeries performed by Dr. Poletti and/or Dr. Johnson in November and December 2004; (b) Walden took Dr. Poletti to dinner, charging the cost to his 4Spine AMEX card; (c) Walden bought tickets for Dr. Poletti to a comedy show at a cost of $671,55, which Walden charged to his 4Spine AMEX card; (d) Walden sent Dr. Aymond a Christmas gift in 2004; (e) on January 21, 2005, Walden took the East Cooper operating room staff out for drinks and dinner, at a cost of $769.05, which Walden charged to his 4Spine AMEX card; and (f) Walden frequently took Karen Blakely, a nurse in Dr. Poletti's employ, to lunch and dinner.  (See October 24, 2005 Walden Dep., Pl. Ex. 281, at 49, 59-62, 67, 117-118, 106, 116, 120-121; January 19, 2005 Walden Dep., Pl. Ex. 14, at 73-80, 86; January 19, 2005 Bell Dep., Ex. 3, at 48-49; October 14, 2005 Bell Dep., Pl. Ex. 266, at 73-74; AMEX Statements, Pl. Ex. 123, 128; June 27, 2006 Tr., at 253.)

Haas testified that Synthes experienced a 79% drop in monthly sales during the restricted period, as compared to Synthes' sales during the prior year.  (See June 7, 2006 Tr., at 212-213.) 4Spine's sales at East Cooper during the restricted period were $377,205, and Stavros calculated

12

that Synthes lost $271,210 in profits. (See Stavros Statistics, Pl. Ex. 87, at Exhibit 2; 4Spine's

Sales Statistics, Pl. Ex. 229.)

**e.      Spine Society Meeting**

On October 23, 2004, Walden attended a South Carolina Spine Society meeting as a

4Spine representative.  (See January 19, 2005 Walden Dep., Pl. Ex. 14, at 59-70.)  Many doctors

and nurses from Walden's former territory attended the conference, including Drs. Rawe,

Khoury, Johnson, and Strohmeyer.  (Id.)

**2.      Evidence against Bell**

During his employment with Synthes, Bell was responsible for servicing the Atlanta West

territory.  This territory included Northside Cherokee Hospital ("Northside"), Henry Medical

Center ("Henry"), Newnan Hospital ("Newnan"), Fayette Community Hospital ("Fayette"),

Southern Regional Medical Center ("Southern"), Spalding Regional Medical Center

("Spalding"), Wellstar Cobb Hosptial ("Cobb"), and Wellstar Kennestone Hospital

("Kennestone").  It also included surgeons operating at one of these facilities, their staff,

operating room personnel, and other hospital personnel with the capacity to influence the

selection of implant vendors.

Like Walden, Bell conceded the accuracy of Synthes' description of the extent of his

contact with staff and physicians at covered hospitals during the restricted period.  (See June 27,

2006 Tr., at 241.)  Bell also conceded that the purpose behind maintaining contact with

physicians and staff in his previous territory was business-related, as he anticipated working with

these doctors as a 4Spine representative after the end of the restricted period.  (Id. at 241, 260.)

Nonetheless, Bell characterized these contacts as "social" in nature.  (Id. at 242.)  Specifically,

13

Bell testified that, during the restricted period, he never referred business or participated in

planning business at Northside, Henry, Newnan, Fayette, Spalding, Cobb, and Kennestone, he

never solicited business on behalf of 4Spine or Globus from any physician, staff member,

hospital, or hospital employee from whom he solicited business in the last year of his

employment with Synthes, and he never engaged in sales calls, promotion of products, or support

or surgeries for 4Spine or Globus at hospitals in the Atlanta West territory.  (Id. at 238-240, 253-

255.)

### a.    Cobb

Bell had the following contact with Cobb physicians and staff during the restricted

period: (a) Bell took Cobb operating room personnel and a hospital assistant out to lunch in

November or December 2004, and paid for the entire lunch; (b) Bell was copied on e-mails by

4Spine and Globus representatives concerning business issues at Cobb; (c) Bell invited Dr. Omar

Jimenez to dinner on October 15, 2004; (d) Bell treated Dr. Jiminez' entire staff to lunch on

October 17, 2004; Bell charged the $187.30 bill to his 4Spine AMEX card; (e) Bell had lunch

with Drs. Omar and Miguel Jiminez in January or February 2005, purchased Christmas gifts for

both doctors in 2004, and participated in the sending of sweatshirts to both doctors; and (f) Bell

sent Dr. Daftari a Christmas gift in 2004 and assisted in 4Spine's mailing of sweatshirts to Dr.

Daftari.  (See January 19, 2005 Bell Dep., Ex. 3, at 27-29, 25; October 14, 2005 Bell Dep., Pl.

Ex. 266, at 35-37, 42-45; Bell. Answers to Interrogatories, Pl. Ex. 287, at 5-6; June 7, 2005 Tr.,

at 169; 4Spine e-mails, Pl. Ex. 150, 152, 160, 163, 185-186, 230.)

Philip Lewis ("Lewis"), Synthes' regional manager for the territory that Bell formerly

serviced, testified that Dr. Daftari refused to meet with Synthes' representatives after Bell's

resignation.  (See June 7, 2006 Tr., at 159-160.)  Lewis also testified that Synthes'
representatives were unable to schedule a lunch with Drs. Jiminez until early 2005.   (Id.)
Although Synthes' products were used in two surgeries in September and December 2004,
Synthes had no further business at Cobb during the first six months of 2005.  (Id.)  4Spine's sales
at Cobb during the restricted period were $173,130.  (See Stavros Statistics, Pl. Ex. 87, at Exhibit
3; 4Spine Sales Statistics, Pl. Ex. 229.) Stavros' calculations of Synthes' lost profits at Cobb
were between $135,561 and $230,966.  (Stavros Statistics, Pl. Ex. 87, at Exhibit 3.)

### b.    Kennestone

Bell had the following contact with Kennestone physicians and staff during the restricted
period: (a) Bell and Mark Christensen ("Christensen"), a co-owner of 4Spine, took three
Kennestone operating room nurses to dinner in December 2004, and Christensen paid for the
meal; (b) Bell called Dr. Chitale to "say hello" and sent wine as a Christmas gift in 2004; (c) Bell
conceded that he actively solicited Dr. Khajavis' business, including scheduling a VIP visit for
Dr. Khajavi to Globus' headquarters; (d) Bell had breakfast with Dr. Malcolm in October 2004,
sent Dr. Malcolm a bottle of wine as a Christmas gift in 2004, helped 4Spine send sweatshirts to
Dr. Malcolm, and helped plan Dr. Malcom's visit to Globus' headquarters; (e) Bell sent Dr.
Moore a bottle of wine as a Christmas gift in 2004 and assisted 4Spine in sending sweatshirts to
Dr. Moore; (f) Bell invited Dr. Moore's nurse and office assistant to lunch; (g) Bell sent Dr.
Javed a Christmas gift in 2004 and helped 4Spine send sweatshirts to Dr. Javed; and (h) Bell
maintained contact with Drs. Daftari, Miguel Jimenez, and Omar Jimenez to the extent described
above.  (See January 19, 2005 Bell Dep., Ex. 3, at 20-25, 38-39, 25; October 14, 2005 Bell Dep.,
Pl. Ex. 266, at 32, 71-72, 74-75, 96-101; July 27, 2005 Tr., at 254; Demski Dep., Pl. Ex. 272, at

68; 4Spine e-mails, Pl. Ex. 150, 160, 262.)

Lewis testified that Synthes' representatives faced "resistance" in attempting to meet with Cobb doctors after Bell's resignation, although Synthes was able to meet with the operating room staff.  (See June 7, 2005 Tr., at 146-148.)  4Spine's sales at Kennestone during the restricted period totaled $440,015.  (See Stavros Statistics, Pl. Ex. 87, at Exhibit 3; 4Spine Sales Statistics, Pl. Ex. 229.)   Stavros' calculations of Synthes' lost profits ranged from $100,183 to approximately $347,664.  (Stavros Statistics, Pl. Ex. 87, at Exhibit 3.)

**c.     Newnan**

Bell engaged in the following contact with Newnan physicians and staff during the restricted period:  (a) Bell took Dr. Kessler on an all-expense paid ski trip from March 18-22, 2005, during which the four parties stayed at DeFrancis' condominium, and to a professional tennis tournament on April 14-15, 2005; (b) Bell treated Dr. Kessler for drinks on October 20, 2004, purchased Dr. Kessler a bottle of wine as a Christmas gift in 2004, and assisting 4Spine in sending sweatshirts to Dr. Kessler; (c) Bell treated the Newman operating room staff for drinks, the cost of which Bell charged to his 4Spine AMEX card; and (d) Bell received inventory from Globus that Newnan paid for and was to use. (See January 19, 2005 Bell Dep., Ex. 3, at 25, 52, 32-36; October 14, 2005 Bell Dep., Pl. Ex. 266, at 39-59, 60-61, 108-110; July 27, 2005 Tr., at 301; Demski Dep., Pl. Ex. 272, at 29-34; Inventory Invoice, Pl. Ex. 216; October 24, 2005 Walden Dep., Pl. Ex. 281, at 87-89, 95-96; January 19, 2005 Walden Dep., Pl. Ex. 14, at 91-92, 95; DeFrancis Dep., Pl. Ex. 270, at 110-111; 4Spine e-mails, at 150, 160, 167; Bell Interrogatory Answers, Pl. Ex. 287.)

16

Lewis testified that, after Bell's resignation, Synthes' representatives were able to meet with certain surgeons at Newnan, such as Dr. Kessler, but had difficulty meeting with other surgeons.  (See June 7, 2006 Tr., at 155-157.)  4Spine's sales at Newnan during the restricted period totaled $118,585. (See Stavros Statistics, Pl. Ex. 87, at Exhibit 3; 4Spine Sales Statistics, Pl. Ex. 229.)  Stavros' calculations of Synthes' lost profits at Newnan ranged from approximately $92,852 to $115,722.  (Stavros Statistics, Pl. Ex. 87, at Exhibit 3; see also Stavros Supp. Rep., Pl. Ex. 292.)

### d.  Fayette

Bell engaged in the following contact with Fayette physicians and staff during the restricted period:  (a) Bell sent sweatshirts to Dr. Rezaiamiri; and (b) Bell took Dr. Danisa to lunch in February or March 2005, spoke to him on the telephone approximately three or four times, and helped 4Spine send sweatshirts to him.  (See October 14, 2005 Bell Dep., Pl. Ex. 266, at 70-71; 4Spine e-mails, Pl. Ex. 150, 160.)

4Spine had $22,450 in sales at Fayette during the restricted period. (See Stavros Statistics, Pl. Ex. 87, at Exhibit 3; 4Spine Sales Statistics, Pl. Ex. 229.)  Stavros determined Synthes' lost profits ranged from $19,927 to $29,530.  (Stavros Statistics, Pl. Ex. 87, at Exhibit 3.)

### e.  Northside

Bell engaged in the following contact with Norshide physicians and staff during the restricted period:  (a) Bell played golf with Dr. Loftman in October and/or December 2004, the cost of which he charged to his 4Spine AMEX card, and sent Dr. Loftman a Christmas gift in 2004; and (b) Bell treated Dr. Loftman's entire staff to lunch during the restricted period. (See

January 19, 2005 Bell Dep., Ex. 3, at 53-54; October 14, 2005 Bell Dep., Pl. Ex. 266, at 61-65;

AMEX statement, Pl. Ex. 118.)

Lewis testified that, after Bell's resignation, Dr. Loftman made himself available for a

lunch meeting, but that Dr. Loftman did not perform another surgery using Synthes' products

before his retirement at the end of 2004.  (See June 7, 2006 Tr., at 153.)  4Spine's sales to

Northside during the restricted period totaled $9,795.  (See 4Spine Sales Statistics, Pl. Ex. 229.)

Although Synthes earned approximately $13,000 per month in sales at Northside between

September 2003 and April 2004, Synthes enjoyed no sales during the restricted period.  (See

Synthes Sales Statistics, Pl. Ex. 74.)

### f. Henry

Bell had contact with one Henry physician, Dr. Danisa, during the restricted period.  Bell

took Dr  Danisa to lunch, spoke with him on the telephone, and helped 4Spine send him

sweatshirts. (See October 14, 2005 Bell Dep., Pl. Ex. 266, at 70-71; 4Spine e-mail, Pl. Ex. 150,

160.)

The amount of 4Spine's sales to Henry during the restricted period was $16,790.  Synthes

did no business at Henry following the entry of the Final Order.  (See June 7, 2006 Tr., at 154.)

4Spine's sales during the restricted period totaled $16,790, and Stavros' calculations of Synthes'

lost profits at Henry ranged from $13,147 to $34,625. (See Stavros Statistics, Pl. Ex. 87, at

Exhibit 3; 4Spine Sales Statistics, Pl. Ex. 229.)

### g. Spalding

Bell engaged in the following contact with Spalding physicians and staff during the

restricted period:  (a) Bell arranged, through 4Spine, for Dr. Velazco to stay at a hotel on March

18

10, 2005, paid the $250.00 cost of his hotel room, and provided Dr. Velazco with a $100 gift certificate towards dinner, the cost of which Bell charged to his 4Spine AMEX card; (b) Bell was involved in 4Spine's distribution of sweatshirts to Dr. Velazco; (c) Bell treated certain members of Dr. Velazco's staff to lunch on three occasions during the restricted period, the cost of which Bell charged to his 4Spine AMEX card; and (d) Bell was involved in 4Spine's distribution of sweatshirts to Spalding regional staff.  (See January 19, 2005 Bell Dep., Ex. 3, at 25, 55; October 14, 2005 Bell Dep., Pl. Ex. 266, at 66-69, 80-81; AMEX statement, Pl. Ex. 124, 129, 135; 4Spine e-mails, Pl. Ex. 150, 160, 168, 178.)

Lewis testified that although Synthes' representatives covered cases immediately after the Final Order, Synthes has not done a single case at Spalding since November 2004.  (See June 7, 2006 Tr., at 159.)  4Spine's sales at Spalding during the restricted period totaled $190,480.  (See Stavros Statistics, Pl. Ex. 87, at Exhibit 3; 4Spine Sales Statistics, Pl. Ex. 229.)  Stavros' calculations of Synthes' lost profits at Spalding ranged from $136,162 to $149,146.  (Stavros Statistics, Pl. Ex. 87, at Exhibit 3.)

### h.    Southern

Bell had contact with one Southern physician, Dr. Valezco, during the restricted period. As described above, Bell paid for Dr. Valezco's hotel room and dinner on his birthday, sent Dr. Valezco sweatshirts and a Christmas gift, and took his staff to lunch on several occasions. (See January 19, 2005 Bell Dep., Ex. 3, at 25, 55; October 14, 2005 Bell Dep., Pl. Ex. 266, at 66-69, 80-81; AMEX statement, Pl. Ex. 124, 129, 135; 4Spine e-mails, Pl. Ex. 168, 178.)  Bell also assisted in 4Spine's distribution of sweatshirts to the staff at Southern.  (See 4Spine e-mails, Pl. Ex. 150, 160.)

19

Lewis testified that Synthes' representatives had a difficult time meeting with Dr. Valasco, although Synthes' representatives were able to meet with another physician who worked at Southern, Dr. Rezaiamiri, and to do cases with him in March 2005.  (See June 7, 2006 Tr., at 157-158.)  4Spine's sales to Southern during the restricted period totaled $462,190.  (See Stavros Statistics, Pl. Ex. 87, at Exhibit 3; 4Spine Sales Statistics, Pl. Ex. 229.)  Stavros's calculations of Synthes' lost profits ranged between $321,784 and $361,895.  (Stavros Statistics, Pl. Ex. 87, at Exhibit 3.)

### i.      East Cooper

Bell engaged in the following contact with East Cooper physicians and staff during the restricted period:  (a) Bell attended surgeries at East Cooper in November and December 2004; (b) Bell worked with Dr. Poletti and/or Dr. Johnson on five cases; and (c) Bell had dinner with Dr. Poletti.  (See January 19, 2005 Bell Dep., Ex. 3, at 48, 53; October 14, 2005 Bell Dep., Pl. Ex. 266, at 73-74; January 19, 2005 Walden Dep., Pl. Ex. 14, at 73, 86; Roof Dep., Pl. Ex. 277, at 78-86.)

4Spine's sales to East Cooper during the restricted period were $377,205, and Stavros determined that Synthes' lost profits at East Cooper totaled $271,210.  (See Stavros Statistics, Pl. Ex. 87, at Exhibit 2; 4Spine Sales Statistics, Pl. Ex. 229.)

### E.      Post-Hearing Submissions

On July 11, 2006, all parties filed proposed findings of fact and conclusions of law. Objections to these proposed findings of fact and conclusions of law were filed on July 18, 2006.

## II.      Discussion

Synthes seeks damages for the April 5, 2005 contempt findings as to Walden and for the

allegations of contempt in Synthes' second motion for contempt.

### A.    Standard

A party seeking contempt sanctions must prove by clear and convincing evidence that: (1) a valid order existed; (2) the alleged contemnor was aware of the order; and (3) the alleged contemnor disobeyed the order.  See, e.g., John T. v. Delaware City Intermediate Unit, 318 F.3d 545, 552 (3d Cir. 2003); Roe v. Operation Rescue, 919 F.2d 857, 871 (1990).   In order to justify a contempt remedy, the provisions of the order which were allegedly violated must be clear and all ambiguities must be resolved in favor of the alleged contemnor.  See Harris v. City of Philadelphia, 47 F.3d 1311, 1326 (3d Cir. 1994).  Indeed, a finding of contempt is improper "if 'there is ground to doubt the wrongfulness of' the defendant's conduct."  Id. (quoting Quinter v. Volkswagen of Am., 676 F.3d 969, 974 (3d Cir. 1982)).

The remedy for civil contempt must be either coercive, compelling compliance with a court order, or compensatory, correcting loss sustained by the misconduct.  See McDonald's Corp. v. Victory Inv., 727 F.2d 82, 87 (3d Cir. 1984) ("civil contempt may be employed to coerce the defendant into compliance with the court's order and to compensate for losses sustained by disobedience").  The damages award must not "exceed the actual damages *caused* the offended party by a violation of the court's order." Quinter v. Volkswagen of Am., 676 F.2d 969, 975 (3d Cir. 1982) (emphasis added); see also Gregory v. Depte, 896 F.2d 31, 34 (3d Cir. 1990) (compensatory damages for civil contempt violation "must not exceed the actual damages caused the offended party").  In other words, an award of damages requires a link, a "sufficiently specific nexus," between the alleged damages and the offending party's violation of the judicial order. Apex Fountain Sales, Inc., 27 F.3d 931, 936 (3d Cir. 1994) (noting that district court in contempt

action will undoubtedly "make particularized findings indicating specifically how the damages are actually linked to the contemptuous behavior it found"); see also Accusoft Corp. v. Palo, 237 F.3d 31, 58 (1st Cir. 2001) (affirming denial of award of damages for civil contempt when plaintiff fails to introduce evidence that defendant's breach of settlement agreement determining rights of competing parties in computer software caused alleged damages, despite evidence that many of plaintiff's customers became customers of defendant after breach and that plaintiff failed to reach projected levels of growth); Ge Harris Railway Electronics, L.L.C. v. Westinghouse Air Brake Co., 2004 WL 1854198, at *13 (D. Del. Aug. 18, 2004).  This causal link applies to all theories and forms of damages, including lost profits, disgorgement of profits, attorneys' fees, lost management time, and costs. See, e.g., McDowell v. Philadelphia Hous. Auth., 423 F.3d 192, 194-195 (3d Cir. 2005) ("The sanction imposed on a civil contemnor for his past conduct may not exceed the actual damages caused by his violation of the court's order."); Inst. for Motivational Living v. Doulus Inst. for Strategic Consulting, Inc., 110 Fed. Appx. 283, 289 (3d Cir. 2004) (compensatory "contempt award must relate to the actual loss (including fees and expenses) that flowed from the contemnor's violation"); Woods v. Woods, 28 F.3d 396, 401 (3d Cir. 1994) (noting that district court can award damages for expenses involved in demonstrating violations, but must adjust award according to principles of causation, to account for limited success of contempt motion);  Nat'l Drying Mach. Co. v. Ackoff, 245 F.2d 192, 194-195 (3d Cir. 1957).[3]

---

[3]Synthes suggests that a disgorgement of profits theory, rooted in principles of equity, relieves Synthes of the burden of establishing a causal link between defendants' contemptuous conduct and defendants' profits.  (See Pl. Conclusions of Law ¶¶ 65-79.)   Synthes further suggests that once a defendants' profits are established in a contempt action, the burden of proof shifts, requiring "the party in contempt to prove that their profits were not derived from their

Although the Third Circuit has yet to specify the appropriate burden of proof for establishing damages in a civil contempt action, most circuit courts addressing this issue have concluded that such damages must be proven by a preponderance of the evidence.  See, e.g., McGregor v. Chierico, 206 F.3d 1378, 1387 (11th Cir. 2000); Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1318 (10th Cir. 1998); In re Gen. Motors Corp,. 110 F.3d 1003, 1017 (5th Cir. 1997).[4]  Because the Court finds, for the reasons expressed below, that Synthes has failed to meet its burden of proving damages flowing from the contemptuous conduct under the lower preponderance of the evidence standard, the Court assumes *arguendo* the applicability of this burden of proof for purposes of resolving Synthes' instant contempt motions without formally deciding this issue.

### B.    First Contempt Motion

misconduct."  (Id.)  This Court disagrees with Synthes' recitation of the law.  Although the cases cited by Synthes certainly stand for the proposition that disgorgement of profits is a viable theory of recovery in contempt actions, particularly in the absence of proof of direct loss to the moving party, these cases do not relieve the party seeking damages from causally linking the contemnor's contemptuous behavior to the contemnor's gain, her acquisition of profits.  See Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 456-457 (1932) (finding that in a proceeding for civil contempt based on violation of injunction in patent infringement action, profits derived from the violation of the injunction are recoverable); Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd., 885 F.2d 1, 6-7 (2d Cir. 1989) (contempt plaintiff my recover contempt defendant's profits derived from violation of consent judgment, even without "direct proof of injury").  To reiterate, the party seeking disgorgement must demonstrate that the contemnor's profits are directly attributable to her wrongful conduct.  See, e.g., Nat'l Drying Mach. Co. v. Ackoff, 245 F.2d at 194-195 (reading Leman as sanctioning the use of profits yielded by contemptuous conduct in the measurement of the injury caused by contemptuous conduct, but not as "relieving the complainant of showing that the contemptuous conduct did, in fact, have substantial injurious effect upon his economic interest").  Any other methodology would transform the equitable remedy of disgorgement into a punitive sanction.

[4]The Court's articulation of a clear and convincing standard of proof for contempt damages in its April 5, 2005 opinion was mere dicta.  (See April 5, 2005 Opinion, at 15.)

Synthes seeks damages for losses allegedly caused by Walden's contemptuous behavior, as defined in the April 5, 2005 opinion, during the restricted period and for a seventh-month period after the restricted period.  This damages calculation includes lost profits, attorneys' fees, lost management time, and additional costs.

### 1.    Lost Profits

Synthes seeks to recover the profits it allegedly lost due to Walden's solicitation of Dr. Khoury and Walden's role in 4Spine's solicitation of Anderson for CNA to participate in a Globus disc study.  (See Pl. Proposed Findings of Fact ¶¶ 94-100, 442-447.)  In response, Walden argues that Synthes has failed to demonstrate the requisite causal link between Walden's contemptuous behavior and the incurrence of those damages identified by Stavros, whether measured as Synthes' loss or 4Spine's gain.  (See Walden's Proposed Conclusions of Law ¶¶ 7-8.)

### a.    Solicitation of Anderson for Globus disc study

The Court finds that Synthes has failed to prove by a preponderance of the evidence that it suffered damages *as a result of* Walden's solicitation of Anderson for CNA to participate in a Globus cervical disc study.  See Apex Fountain Sales, Inc., 27 F.3d at 936 (relief in civil contempt action may remedy only those damages "caused" by violation); Cottman Transmission Sys., Inc. v. Melody, 851 F. Supp. 675, 676 (E.D. Pa. 1994) (remedy in civil contempt action may compensate "for losses or damages sustained as a result of disobedience and noncompliance with a court order").   There are several reasons for this conclusion.  First, Synthes did not have a test site to offer CNA to complete a disc study or clinical trials open for artificial cervical disks. (See June 7, 2006 Tr., at 26, 34.)  Second, CNA never participated in a Globus disc study at a

Globus site, but, instead, chose a test site with Danek, its primary vendor.  (Id. at 26, 30.)  Third, although Synthes contends that Walden's solicitation of Anderson tainted the competitive landscape, thereby inhibiting CNA's use of Synthes' products at St. Francis, Synthes failed to present any affirmative evidence for this proposition:   Synthes' damages expert offered no testimony as to a causal link between Walden's contemptuous conduct, as identified by the April 5, 2005 opinion, and Synthes' loss of CNA sales after the entry of the Final Order.  (Id. at 29-30, 36-37.)  Finally, other factors further highlight the absence of causation between Walden's contemptuous behavior and Synthes' decline in sales with CNA during the restricted period at St. Francis:   St. Francis entered into an exclusive contract with Danek in early 2005 to purchase bone product, that which constituted the majority of Synthes' sales to CNA; and St. Francis implemented a capitated pricing structure which Haas admitted may have influenced CNA non-use of Synthes' products.  (Id. at 29-30.)

### b.      Contact with Dr. Khoury

The Court also finds that Synthes failed to prove that it suffered damages as a result of Waldens' facilitation of Dr. Khoury's use of Globus products during three surgeries at Trident and one surgery at St. Francis.  See Apex Fountain Sales, Inc., 27 F.3d at 936; Cottman Transmission Sys., Inc. v. Melody, 851 F. Supp. at 676.  Synthes provided no evidence that, but for Walden's contemptuous action, Dr. Khoury would have used Synthes' products in performing surgeries at Trident or St. Francis.  Indeed, Haas, Synthes' lone witness on the issue of damage causation, offered no testimony as to whether Synthes' products would have been used during Dr. Khoury's surgeries at Trident or St. Francis; in fact, Haas conceded in an October 26, 2005 e-mail to Stavros that "[w]e will never know what would have happened if Walden had not been

involved with Khoury." (June 7, 2006 Tr., at 29-30, 36-37; Haas/Stavros e-mail correspondence, Def. Ex. 22.) Stavros also admitted that he did not know whether Dr. Khoury ever performed a surgery at Trident using Synthes' products. (June 7, 2006 Tr., at 92.) St. Francis' initiation of a capitated pricing structure to the detriment of Synthes' business also belies Synthes' assumption that Dr. Khoury would have used Synthes' products at St. Francis. Further highlighting the absence of causation is the fact that Dr. Khoury was—and remains—a user of Danek products. (Id. at 90-92.)

### c. Dr. Rawe's Use of Globus Products at St. Francis

The Court rejects Synthes' claim for damages regarding Dr. Rawe's use of Globus products at St. Francis. Synthes' claim for damages rests upon two evidentiary failings. First, the requisite finding of contempt is lacking: the Court never found that Walden solicited Dr. Rawe in violation of the Final Order, and Synthes' lone fact witness during the hearing on the first contempt motion lacked personal knowledge of such solicitation. (See June 7, 2006 Tr., at 37.) Second, Synthes failed to establish any link, let alone a causal nexus, between Dr. Rawe's non-use of Synthes' products at St. Francis and Walden's contemptuous solicitation of Dr. Khoury and Anderson. Quite simply, there is no evidence either that Dr. Rawe used Globus' products at St. Francis as a result of Walden's solicitation of Dr. Khoury and Dr. Anderson, as opposed to as a result of other factors, or that Dr. Rawe would have used Synthes' products in the absence of such contemptuous behavior.

### 2. Attorney's Fees and Costs

An award of attorneys' fees and costs, including lost management time, are appropriate remedies to compensate a party for losses caused by the contemnor's violations. See, e.g.,

Woods, 28 F.3d at 399-400; 17 C.J.S. Contempt § 149 (2006).  This Court finds that Synthes is entitled to the reasonable value of its attorneys' fees and costs, including lost management time, incurred in prosecuting the successful contempt allegations against Walden.  Synthes may submit a fee petition for attorneys' fees and costs, including lost management time.

### C.     Second Contempt Motion

In order for Synthes to recover damages through its second contempt motion, Synthes must establish by clear and convincing evidence that the allegations against Bell and Walden in this motion resulted in a violation of the Final Order.  If successful, Synthes must then prove by a preponderance of the evidence that Synthes incurred a quantifiable amount of damages as a result of this contemptuous behavior.

#### 1.     Contempt

The Final Order prohibits defendants from engaging in three categories of behavior: (1) "engag[ing] in sales calls, promotion of products, or support of surgeries" for 4Spine or Globus in their former territories; (2) "solicit[ing] business from any hospital, hospital employee, physician, or physician staff member" from whom they solicited business in the last year of their employment with Synthes; and (3) referring business to other persons in their former territories, providing business advice about their former territories, and planning business development in their former territories.  (Final Order ¶¶ 1-3.)

Synthes argues that Walden and Bell engaged in a pattern of prohibited competitive activity with covered entities in their previous territories.  (See Pl. Final Mem., at 1-23.) Specifically, Synthes argues that the evidence "shows a widespread pattern by [contempt] Defendants of business planning activities, solicitations, and prohibited business contact

designed to support existing customer relationships and sales, promotion of product, referral of business, and business development." (Id. at 1.)

In response, Bell and Walden concede that they engaged in the contact described by Synthes, but disagree with Synthes over the implication to be drawn from this behavior. (See June 27, 2006 Tr., at 167-176, 229, 241.) Bell and Walden classify their contact with covered entities as purely social in nature. Furthermore, they argue that the content of the communication during these social activities never touched upon business-related issues, such as the promotion of products, sales calls, support of surgeries, business development, or solicitation of business on behalf of Globus or 4Spine. (See Bell Objections to Synthes' Conclusions of Law ¶¶ 10-11; Walden Proposed Conclusion of Law ¶¶ 13-14; June 27, 2006 Tr., at 164-176.) Accordingly, contempt defendants argue that the Court must deny Synthes' amended motion for contempt for the very reason the Court denied Synthes' original accusations of contempt regarding Walden's relationship with Dr. Reuben: the failure to prove by clear and convincing evidence that this contact exceeded the limits of "purely social" behavior to constitute business competition. (See Bell Objections to Synthes' Conclusions of Law ¶¶ 10-11; Walden Proposed Conclusion of Law ¶¶ 13-14; June 27, 2006 Tr., at 164-176.)

Before deciding whether contempt defendants' particular contact with covered entities during the restricted period violated the Final Order, the Court must first resolve a debate over the proper interpretation of the Final Order. As discussed in the Court's April 5, 2005 opinion, the Final Order does not prohibit all contact between contempt defendants and covered entities during the restricted period; instead, the Final Order, on its terms, only prohibits contact which constitutes "engag[ing] in any competitive activity," such as by promoting products, soliciting

business, or planning business development on behalf of 4Spine or Globus.  Clearly inherent in these prohibitions is the acceptability of engaging in contact with covered entities in contempt defendants' former sales territories for a purely social purpose.  However, to the extent these contacts partake in an additional, business-related purpose proscribed by the Final Order, such as contact that seeks immediate and future business for 4Spine or Globus in violation of ¶ 2's "solicit business" prohibition, this contact becomes contemptuous.  In other words, although defendants correctly note that involvement with covered entities for a purely social purpose does not transgress the terms of the Final Order, involvement with covered entities for both a social and business-development purpose violates the clear terms of the Final Order.

Armed with this distinction between contact with a purely social purpose and contact with the dual purpose of socializing and business development, the Court finds that Synthes has met its burden of demonstrating by clear and convincing evidence that *all* of defendants' contact with covered entities during the restricted period violated one or more provisions of the Final Order.[5]  Specifically, the Court finds defendants' contacts with physicians in the Atlanta West

_____

[5]This Court finds that business-related contact by either Bell or Walden with East Cooper would constitute a violation of ¶ 2 of the Final Order.  Although East Cooper was removed from the Charleston South territory on February 12, 2004, the Court finds that, based upon the testimony presented, Walden solicited business at East Cooper in December 2003 and April 2004 by attending, participating in, and/or facilitating surgeries using Synthes' products at East Cooper, thereby making East Cooper a hospital falling within the ambit of ¶ 2 of the Final Order. (See June 7, 2006 Tr., at 232-234; June 27, 2006 Tr., at 85, 211-213, 230-232; Purchase Order, at Pl. Ex. 34, 35, 37, 86.)  Furthermore, the Court interprets the Final Order as preventing all defendants from soliciting business from any hospital, physician, or physician staff member with whom any defendant solicited for business purposes during his last year of employment with Synthes; the Final Order is unambiguous in its grouping together of all defendants and their solicitation practices ("with whom they had solicited"): it expressly prevents a defendant, such as Bell, from soliciting physicians that another defendant, such as Walden, solicited during his last year with Synthes.

29

and Charleston South territories violate the Final Order because such contact was conducted, performed, and staged, in part, with the objective of soliciting business for 4Spine or Globus, promoting Globus' products, and/or planning business development.

A myriad of facts, when analyzed collectively, establish by clear and convincing evidence that defendants' contact with covered entities during the restricted period constituted competitive activity in violation of the Final Order.  First, defendants notified covered entities that they had switched to 4Spine and were no longer working for Synthes, and then systematically proceeded to entertain and interact with these physicians, staff, and hospital personnel while other 4Spine representatives sold Globus' products to them.  (See June 27, 2006 Tr., at 303-304.)  Second, contempt defendants had a financial, business-related incentive in maintaining a close business relationship with each doctor, staff member, and hospital:  pursuant to their contract with 4Spine, defendants would receive 18% commission on sales from their former territories after the expiration of their non-compete agreements with Synthes.  (See June 27, 2006 Tr., at 242.)  Third, defendants paid for the events, items, and outings, which were often extravagant in price and nature, such as Walden's fishing trips and golfing outings with Drs. Reuben, Mazluff, and Tyler, Walden's purchase of $726.82 cigars for Dr. Pacult, Walden's purchase of Jerry Seinfeld tickets for Dr. Poletti at a cost of $671.55, Walden's dinner with the East Cooper operating room staff at a cost of $769.05, Bell's subsidization of Dr. Valazco's hotel room and dinner on his birthday, and defendants' five-day ski trip to Utah with Dr. Stovall and Dr. Kessler, during which defendants' paid for the doctors' air fare and dinners and stayed at the condominium of 4Spine's co-principal. (See Pl. Proposed Findings of Fact ¶¶ 128-403.)  In fact, the cost of these contacts with covered entities was frequently charged to contempt defendants' 4Spine AMEX cards; the

statements were then sent to 4Spine, which paid at least the first $1,000 of each monthly statement.  (See June 27, 2006 Tr., at 251, 260-261; AMEX Statements, Pl. Ex. 111-139.)  Fourth, contempt defendants received sales information from their former territories during the restricted period, thereby suggesting their involvement in business planning.  (See Sales Information, Pl. Ex. 247, 254.)  Fifth, defendants invoked the aid of 4Spine representatives in arranging certain contacts, including the sending of sweatshirts to many of the doctors in Bell's former territory, making travel, dinner, and lodging arrangements for defendants' Utah trip with Drs. Kessler and Stovall, arranging for Dr. Khajavi to visit Globus' headquarters, arranging for Dr. Khoury's participation in a Globus' disc study, and conveying information from Dr Reuben to 4Spine and Globus to enable Globus to remain a vendor at Beaufort.  (See 4Spine e-mails, Pl. Ex. 150, 160; Walden Dep., Pl. Ex. 281, at 63-66, 89; Bell Dep., Pl. Ex. 266, at 49-50, 96-101, 109-110; June 27, 2006 Tr., at 254-255; 4Spine e-mail, Pl. Ex. 233, 234.)  Finally, and perhaps most importantly, defendants conceded that the purpose of maintaining contact with doctors with whom they previously worked was to resume business relations after the completion of the restricted period; these admissions are fatal to their assertion as to the purely social nature of the contacts.  (See June 27, 2006 Tr., at 241-242, 260; Walden Dep., Pl. Ex. 266, at 71.)[6]

### 2.      Damages

Synthes seeks damages in the form of lost profits, disgorgement of profits, attorneys' fees, lost management time, and costs.

### a.      Lost Profits/Disgorgement of Profits

---

[6]Indeed, while working for Synthes, defendants engaged in the same business-related methodology of entertaining clients through social activities.

The Court finds that Synthes has failed to establish the requisite causal link between defendants' contemptuous conduct and Stavros' damage calculations.  For instance, in rendering his damage calculations, Stavros assumed a causal link between 4Spine's sales and Synthes' losses, on one hand, and the contempt defendants' contacts with the covered entities, on the other hand.  (See July 27, 2006 Tr., at 108-112.)  In other words, Stavros assumed that 100% of Synthes' business losses and 100% of 4Spine's profits during the restricted period were attributable to defendants' contemptuous contempt, that every 4Spine sale and every Synthes business loss in Charleston South and Atlanta West were a result of a violation of the Final Order.  (Id. at 100, 104.)  Through this methodology, Stavros never attempted to isolate the effect of other causes on the volume of sales of 4Spine and Synthes during the restricted period or to apportion losses between the alleged contempt and these other possible causes, including the preference of physicians to use non-Synthes' products, the entry of Globus/4Spine into the competitive marketplace, the competitive activities of other 4Spine and Globus employees both prior to and during the restricted period, Synthes loss of the marketplace to Globus and other competitors prior to the restricted period, and the loss of Bell and Walden, experienced sales personnel, from Synthes' staff.  (Id. at 88-90, 121, 123.)  Stavros even conceded that Synthes' sales demonstrated a "significant" decrease prior to the Final Order period, that he could not identify a single customer that Synthes lost due to defendants' contemptuous activity, that his damages calculations included lost profits from surgeries conducted before defendants' contemptuous behavior commenced, that he never gathered evidence from customers or surgeons who made purchasing decisions, and that he could not identify a surgeon or customer who was more likely than not to switch back to Synthes during the restricted period in the absence of

defendants' contemptuous conduct.  (Id. at 104, 110, 128-129.)   The result of this methodology is a damage calculation that measures Globus' financial impact on the spinal implant marketplace within contempt defendants' former territories during the restricted period, without any nexus between these losses and the contempt defendants' violations of the Final Order; this is an assessment of damages without an evidentiary footing.

Nor does Synthes provide other evidence, whether in the form of documentation or oral testimony, to suggest that defendants' contemptuous conduct resulted in the specific losses identified by Stavros.  Synthes' remaining witnesses during the hearing on the second contempt motion testified as to the manner in which contempt defendants violated the Final Order, as to some of the resistance they faced in speaking with covered entities after defendants' resignation, and as to Synthes' sales expectations in the Charleston South and Atlanta West territories after contempt defendants' resignations; they did not provide an evidentiary basis for the Court to identify what specific losses or gains were the result of the contemptuous behavior, as opposed to other causes (i.e., the loss of Walden and Bell as Synthes' sales representatives, the entry of Globus into the marketplace, formation of exclusive contracts with other vendors, etc.). Furthermore, Synthes introduced no evidence from individual physicians, staff, or hospital personnel suggesting that they would have continued to use Synthes' products in the absence of the contemptuous behavior of Bell and Walden, or that their use of Globus' products was influenced by their contact with Bell or Walden during the restricted period.

In summary, this Court believes that Synthes probably incurred some loss of profits from the contemptuous behavior of Bell and Walden.  The problem, however, is that Synthes has failed to demonstrate by a preponderance of the evidence that Synthes' losses or 4Spine's profits,

as quantified by Stavros, were caused by defendants' violations of the Final Order.   Nor has Synthes provided a methodology and record by which the Court could calculate, with some reasonable or equitable degree of precision, that portion of Synthes' losses or 4Spine's profits attributable to contempt defendants' behavior.  Accordingly, the Court denies Synthes' motion to the extent it seeks lost profits or the disgorgement of 4Spine's profits.

**b.**      **Attorneys' Fees and Costs**

The Court finds that Synthes is entitled to the entirety of its attorneys' fees incurred in connection with the second motion for contempt.  Synthes successfully proved each allegation of contempt in its second motion for contempt.  As the successful party, Synthes is therefore entitled to submit a fee petition for recovery of attorneys' fees.

The Court also finds that Synthes is entitled to all lost management time incurred in connection with the second motion for contempt.  This includes the reasonable value for the time spent by Synthes' employees in assisting with the preparation and prosecution of the second contempt motion.  (See Synthes Proposed Findings of Fact ¶¶ 481-493.)  As Synthes' calculation of lost management time in its proposed conclusions of law does not distinguish between the time its witnesses spent in connection with the successful contempt allegations against Walden in the first contempt motion and the time these witnesses spent in connection with the second contempt motion, the Court will permit Synthes to submit, in conjunction with its petition for attorneys' fees, a request for lost management time based upon Synthes' employees participation in the prosecution of the second motion for contempt.

**III.    Conclusion**

For the preceding reasons, this Court denies Synthes' request for lost profits or, in the

alternative, disgorgement of profits both in its first motion for contempt and in its second motion for contempt.  Nonetheless, the Court finds that Synthes may recover that proportion of its attorneys' fees and costs, including lost management time, incurred in connection with its proven allegations of contempt–the contempt findings in the Court's April 5, 2005 opinion and all the allegations of contempt in Synthes' second motion for contempt.   An appropriate Order follows.